IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROBYN MICHELLE WINGO | : | CIVIL ACTION |
| | : | |
| v. | : | No. 24-582 |
| | : | |
| EDUCATIONAL DATA SYSTEMS, INC. | : | |
| | : | |

**MEMORANDUM**

**Judge Juan R. Sánchez**                                                                             **August 19th, 2025**

      From February 2021 to August 2022, pro se Plaintiff Robyn Michelle Wingo was an employee for Defendant Educational Data Systems, Inc., ("EDSI"). In August 2022, EDSI terminated Wingo for performance and behavioral issues. On February 2, 2024, Wingo brought claims for discrimination, retaliation, and harassment under Title VII of the Civil Right Act of 1964, as amended, 42 U.S.C. §2000e, et seq. ("Title VII"), alleging EDSI discriminated against her because of her race and retaliated against her for exercising her rights under Title VII. EDSI has moved for summary judgment on all claims. Because Wingo cannot make a prima facie case of discrimination and retaliation and because there is no evidence of severe and pervasive conduct for a harassment claim, EDSI's motion will be granted and judgment will be entered in its favor.

**BACKGROUND**

      In February 2021, Wingo was hired as a remote, temporary (twelve weeks) Workforce Services Greeter at EDSI. Dep. R. Wingo 15:17-17:6, ECF No. 26-4 at 15-18.[1] On or about June 30, 2021, Wingo was offered and accepted a full-time position as an Administrative Assistant in EDSI's Bristol office, where her direct supervisor was Jessica Peterson—Operations Manager of

---

[1]     Citations to the record include pin cites to both the exhibit's self-pagination and the ECF pagination for ease of reference.

the Bristol office. *Id*. at 19:3-23:5, ECF No. 26-4 at 20-24. As part of her Administrative Assistant role, Wingo was required to greet and assist job seekers, employees, and agency visitors who came to the Bristol office. *Id*. at 22:12-23, ECF No. 26-4 at 23. Around the same time, COVID-19 restrictions were being slowly lifted, and the Bristol office had just become open for in-person services. *Id*. at 20:6-21:16, ECF No. 26-4 at 21-22.

The first documented issue occurred on January 12, 2022, when Wingo missed a scheduled training session without notifying Peterson. *Id*. at 27:23-30:23, ECF No. 26-4 at 28-31. The next day, Peterson asked Wingo over email why she missed the scheduled training. Peterson Email, January 13, 2022, ECF No. 26-5 at 12. Wingo, adding non-EDSI people to the email chain, replied she had to complete a survey that Peterson asked her to do, so she could not make the meeting. *Id*., ECF No. 26-5 at 11. After Peterson removed the other people from the email chain, Wingo added them back. *Id.*, ECF No. 26-5 at 10-11; Dep. R. Wingo, 26:1-18, ECF No. 26-4 at 27. The matter ultimately culminated with Andre J. Hardy, a Regional Director of Operations for EDSI who was added to the email chain by Wingo, instructing Wingo that all EDSI matters and disputes should be discussed within EDSI and in person.[2] Peterson Email, January 13, 2022, ECF No. 26-5 at 10.

Later that month, Peterson completed Wingo's performance review. Wingo received a 2.33 out of 4. Dep. R. Wingo, 31:4-33:11, ECF No. 26-4 at 32-34. The review included positive comments about Wingo's punctuality, diligent work, and her submission of an assignment that a partner organization needed. Performance Review, January 11, 2022, ECF No. 26-5 at 13-22. The review also noted areas for improvement, such as Wingo's ability to manage stress, her communication with customers and coworkers, and her perception of team dynamics. *Id*. Peterson

---

[2] According to Wingo, she added Hardy because she believed Peterson was harassing her via email and it was necessary for Hardy and other supervisors to be aware of Peterson's email that were "affecting [her] negatively during the work day." Pl.'s Reply ¶ 10, ECF No. 29 at 4.

specifically requested Wingo ask for coverage of the front desk if she needed to step away and that she share concerns about her work directly with Peterson. *Id*.

On March 7, 2022, Peterson wrote an e-mail to Hardy summarizing a meeting she had with Wingo to discuss Wingo's performance and provide support. Peterson Email, March 7, 2022, ECF No. 26-5 at 23-24. In the email, Peterson stated Wingo refused the option of weekly check-ins, did not want Peterson to email her, and failed to provide the best way and time to communicate with her. *Id*. The email also included concerns raised by other EDSI staff about Wingo's negative interaction with customers, coworkers, and people from partner organizations. *Id*. Wingo denied these allegations and claimed she did not want Peterson to email her because the emails felt like harassment and retaliation. Dep. R. Wingo, 38:5-40:8, ECF No. 26-4 at 39-41. As a result of these concerns, on March 30, 2022, Wingo was placed on a Value Action Plan ("VAP") to help improve her performance. VAP, March 30, 2022, ECF No. 26-5 at 25-27.

From May 2022 to June 2022, numerous EDSI employees and partner organization staff members complained about Wingo's behavior. On May 23, 2022, Crystal Bivens, an EDSI employee, reported an incident that occurred outside of work where Wingo shouted at her and complained about Peterson. Bivens Compl., May 23, 2022, EDSI 081-082, ECF No. 26-6 at 8-9. On June 2, 2022, Peterson reported an argument between her and Wingo when she pointed out that Wingo must wear a facemask while interacting with customers. Peterson Compl., June 2, 2022, EDSI 084, ECF No. 26-6 at 11. Wingo replied that Peterson was singling her out. *Id*. That same day, Amanda Masullo, a staff member at a partner organization, reported Wingo had a negative tone and was unwelcoming toward staff members and customers. Masullo Compl., June 2, 2022, EDSI 086, ECF No. 26-6 at 13. On June 6, 2022, Megan Meinert, who conducted a professional development workshop for EDSI employees that Wingo attended, reported Wingo was publicly

complaining about Peterson's communication style at the workshop. Meinert Compl., June 6, 2022, EDSI 092-093, ECF No 26-6 at 18-19. As a result of the complaints, Hardy emailed Reina Kimso, EDSI's Director of Human Resources, on June 6, 2022, with a list of concerns about Wingo's conduct and the need for a swift resolution. Hardy Email, June 7, 2022, EDSI 095-099, ECF 26-6 at 21-25.

The next day, Michelle Ruiz, EDSI's Talent Manager, met with Wingo to address the complaints. Dep. R. Wingo, 43:4-48:18, ECF No. 26-4 at 44-49. During the meeting, Wingo shared she was unhappy with the company and felt unsupported. Ruiz Email, June 7, 2022, ECF No. 26-5 at 28-29. Specifically, she felt harassed and targeted by Peterson for escalating every situation and felt humiliated for having to find coverage to use the restroom. *Id*. When asked how the company can best support her, Wingo responded, "I don't know but I'm treated like a second-class citizen." *Id*. She appreciated the opportunity to share her perspective and stated that "being a black employee with so many qualifications, [she] feel[s] [she] should be treated better." *Id*. Instead, she felt she was being "wronged." *Id*. Ultimately, Wingo suggested Peterson stop reprimanding her and provide more support for her on lunch and bathroom breaks to help her improve her performance. *Id*.

Later that morning, Wingo was asked to leave work for the rest of the day due to an incident involving Peterson. Peterson Email, July 7, 2022, EDSI 090-091, ECF No. 26-6 at 15-16. According to Peterson, the incident occurred when she discovered the front desk area unstaffed with the phone ringing and two customers left unattended. *Id*. Peterson covered the front desk for several minutes until Wingo returned. *Id*. Peterson asked Wingo to not leave the front desk unattended, but Wingo yelled, "I'm damned if I do and I'm damned if I don't, stop harassing me, I just got off the phone with Michelle Ruiz because of how much you harass me, I have no support

4

up here and need to leave my workstation." *Id*. Peterson asked Wingo to lower her voice, but Wingo continued to get louder in front of customers. Peterson then stepped away to contact Hardy about the incident, and they decided it was best to ask Wingo to leave for the rest of the day. Wingo, on the other hand, claims Peterson was the one who escalated the incident and caused a scene. Pl.'s Reply ¶ 28, ECF No. 29 at 6. As a result, on June 8, 2022, Wingo and Peterson appeared before EDSI's Community Connections Forum ("CCF"), a group of EDSI employees that reviews personnel matters and makes recommendations. Dep. R. Wingo, 57:7-16, ECF No. 26-4 at 58. Following the meeting, CCF recommended that Wingo be placed on a second VAP. Ruiz Email, August 11, 2022, EDSI 203-206, ECF No. 26-6 at 27-30.

On June 17, 2022, Wingo received a second VAP for ongoing performance issues. VAP, June 17, 2022, ECF No. 26-5 at 30-32. The second VAP was extended to August 11, 2022, because Wingo missed check-ins and was unable to "consistently emerge in all goal areas," such as arriving to work on time and communicating effectively with colleagues and customers. Ruiz Email, August 11, 2022, EDSI 204, ECF No. 26-6 at 28. From July 2022 to August 2022, Peterson reported her observations of Wingo's job performance to Hardy. The observations included Wingo arriving to work late, eating at her desk, missing or arriving to weekly morning staff meetings late, taking long breaks, and not answering voicemails or requesting help to answer voicemails. *See* Peterson Email, July 21, 2022, EDSI 141-145, ECF No. 26-6 at 38-42; Peterson Email, July 22, 2022, EDSI 161-162, ECF No. 26-6 at 44-45; Peterson Email, August 3, 2022, EDSI 168-169, ECF No. 26-6 at 47-48.

In early August 2022, two additional EDSI employees complained about Wingo's behavior at work. Todd Richter, EDSI's Assessment Supervisor, reported that when he questioned Wingo about not answering phones, Wingo stated loudly, "I'm going to resign, I'm going to resign."

5

Richter Compl., EDSI 180-181, ECF No. 26-6 at 53-54. To avoid escalation in front of customers, Richter left and returned later to inform Wingo that the outburst cannot occur in front of customers. *Id*. Stephanie Foster, EDSI's Outreach and Intake Coordinator, reported that Wingo treated her disrespectfully after Foster volunteered to cover the front desk for her. Foster Compl., EDSI 166-167, ECF No. 26-7 at 2-3.

On August 9, 2022, Wingo had a second meeting with CCF to discuss her second VAP. *See* Peterson Email, August 8, 2022, EDSI 187, ECF No. 26-7 at 5. Prior to the meeting, Peterson reported to Ruiz that Wingo acted inappropriately towards her and raised her voice several times. Peterson Email, August 9, 2022, EDSI 192, ECF No. 26-7 at 7. After Wingo's meeting, CCF recommended Wingo be terminated from EDSI "due to ongoing performance [and] behavior struggles." CCF Recommendation, EDSI 057, ECF No. 26-7 at 9. That same day, an EDSI employee reported to Peterson that Wingo shared personal medical information of a partner staff member to another partner staff member in the restroom. ECF No. 26-7 at 7. Wingo was ultimately terminated by EDSI on August 23, 2022. ECF No. 26-7 at 9.

Wingo claims she was treated differently from prior Administrative Assistants. Pl.'s Resp. Interrog. ¶ 6, ECF No. 26-5 at 35-36. She asserts that prior Administrative Assistants were permitted to take breaks and leave the front desk without getting someone to cover. *Id*. She identifies three prior Administrative Assistants: (1) a Black woman, whom she does not name; (2) Foster, a white woman; and (3) Sam, a Persian or Middle Eastern woman. *Id*. Wingo also claims Sam and Foster were also allowed scheduling flexibility, and she was not. *Id*. ¶ 7, ECF No. 26-5 at 36. She alleges Sam was able to leave at 4 p.m. every day, and Foster, while working as a "CRC Navigator" for EDSI, was able to set her schedule. *Id*.

6

Wingo also asserts Foster left a Chipotle flyer on her desk after overhearing Wingo say she wanted a career in management. Dep. R. Wingo, 79:8-83:7, ECF No. 26-4 at 80-84. The flyer was for a management position at a local Chipotle. *Id*. Wingo believes Foster would not have done that to a white person with Wingo's credentials. *Id*. As to Peterson, Wingo acknowledged that Peterson never made any derogatory racial statement to her but asserts there was "unconscious race bias" at play. *Id*. at 83:8-84:25, ECF No. 26-4 at 84-85.[3]

As a result of the foregoing, Wingo filed the Complaint on February 2, 2024, and amended it on Apil 19, 2024, alleging discrimination, retaliation, and harassment under Title VII. On February 4, 2025, EDSI moved for summary judgment.

**STANDARD OF REVIEW**

A court must grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts "affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the [non-moving] party." *Id*. at 248.

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks and citation omitted). To defeat summary judgment, "a nonmoving party must adduce more than a mere scintilla of evidence in its favor . . . and cannot simply reassert factually unsupported allegations contained in its pleadings[.]"

---

[3]  Wingo claims EDSI staff members told her that the way Peterson treated her was because of her race. Dep. R. Wingo, 83:9-13, ECF No. 26-4 at 84. However, Wingo failed to identify anyone who made such a statement or identify when such a statement was made.

7

*Williams v. Borough of W. Chester, Pa.*, 891 F.2d 458, 460 (3d Cir. 1989). In evaluating a motion for summary judgment, a court must "view all facts in the light most favorable to the non-moving party and draw all inferences in that party's favor." *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019). A pro se plaintiff "is not relieved of [their] obligation under Rule 56 to point to competent evidence in the record that is capable of refuting a defendant's motion for summary judgment." *Edwards v. Rice-Smith*, 606 F. Supp. 3d 151, 154 (E.D. Pa. 2022) (quoting *Dawson v. Cook*, 238 F. Supp. 3d 712, 717 (E.D. Pa. 2017)).

**DISCUSSION**

Wingo brings claims of discrimination, retaliation, and harassment under Title VII. Discrimination and retaliation claims under Title VII are governed by the three-part burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). First, the plaintiff must establish a prima facie case of discrimination or retaliation. Second, if the plaintiff succeeds in establishing a prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory or nonretaliatory reason for the employer's conduct. Finally, if the defendant succeeds, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were pretext for discrimination or retaliation. *Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 308-09 (2025) (citing *McDonnell Douglas Corp.*, 411 U.S. at 802-04); *Smith v. City of Atl. City*, 138 F.4th 759, 775 (3d Cir. 2025).

Wingo, a Black woman, alleges she was discriminated against based on her race. To establish a prima facie case of race discrimination, a plaintiff must prove: (1) she is a member of a protected class; (2) she was qualified for the position she sought to attain or retain; (3) she suffered an adverse employment action; and (4) the action occurred under circumstances that could

give rise to an inference of intentional discrimination. *Robinson v. Nat'l R.R. Passenger Corp*, 821 F. App'x 97, 101 (3d Cir. 2020) (citation and quotation marks omitted).

EDSI concedes that the first three elements are met but argues Wingo failed to satisfy the fourth. To determine whether an action occurred under discriminatory circumstances, courts look at "comparisons to similarly-situated employees." *Evans v. Sch. Dist. of Phila.*, Civ. No. 23-1086, 2024 WL 4199010, at *2 (3d Cir. Sept. 16, 2024). Wingo points to the three previous receptionists as comparisons: an unnamed Black woman, a White woman (Foster), and a Persian or Middle Eastern woman (Sam). Wingo alleges she was not allowed to leave the front desk for bathroom breaks without finding cover, but her comparators were permitted to do so. She also asserts she was not permitted to work remotely, but Sam and Foster were permitted to work remotely and shape their schedule.

Wingo has failed to produce sufficient evidence to support either assertion. For the bathroom breaks allegation, Wingo was unable to identify any instances where her comparators were allowed to leave without cover and failed to support her assertion with any evidence whatsoever. For the remote work and flexible schedule allegation, Wingo's assertion fails because the evidence shows her comparators were not similarly situated. First, she baldly asserts she observed Sam leave work early and be able to work remotely when Sam was the Administrative Assistant. Even if this is true, Wingo admits this was when the office was under COVID-19 restrictions. Wingo, on the other hand, was an Administrative Assistant after the restrictions were lifted. As such, Sam is not a similarly situated comparator. Foster is also not a similarly situated comparator because, at the time Wingo alleges she had access to a flexible schedule, she was employed in a different role as a CRC Navigator. Wingo's prima facie case for race discrimination,

9

therefore, fails because she has failed to show she was treated differently from similarly situated comparators.

Turning to the retaliation claim, to make a prima facie case of retaliation, a plaintiff must prove "(1) she engaged in a protected activity, (2) she suffered an adverse employment action, and (3) there was a causal connection between the participation in the protected activity and the adverse action." *Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 257 (3d Cir. 2017). As to the second element, Wingo suffered an adverse employment action because she was fired. She also engaged in protected activity under Title VII. An employee engages in protected activity when she "(1) participates in Title VII proceedings or [s]he (2) opposes what an employee reasonably believes to be conduct that is unlawful under Title VII." *Jenkins v. Ciocca Mgmt., Inc.*, 762 F. Supp. 3d 416, 432 (E.D. Pa. 2025). This "includes not only an employee's filing of formal charges of discrimination against an employer but also 'informal protests of discriminatory employment practices, including making complaints to management.'" *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015) (quoting *Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 135 (3d Cir. 2006)). "Thus, 'when an employee communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication virtually always constitutes the employee's opposition to the activity'" *Onely v. Redner's Markets, Inc.*, 697 F. Supp. 3d 410, 425 (E.D. Pa. 2023) (quoting *Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 555 U.S. 271, 276 (2009) (cleaned up)).  Wingo engaged in protected activity at the June 7, 2022, meeting with Ruiz when she complained about her treatment as a Black employee.[4]

---

[4]   In her response to EDSI's interrogatories, Wingo alleges she made at least ten reports of discrimination and harassment against her in August 2022. Pl.'s Resp. Interrog. ¶ 10, ECF No. 26-5 at 37-38. However, there is no record of any of the reports. She also asserts she wrote to a local

For the third element, causation, a plaintiff "must produce evidence 'sufficient to raise the inference that her protected activity was the likely reason for the adverse [employment] action.'" *Carvalho-Grevious*, 851 F.3d at 259 (quoting *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997)). A plaintiff "may rely on a broad array of evidence," such as "employer's inconsistent explanation for taking an adverse employment action . . . a patten of antagonism . . . or temporal proximity unusually suggestive of retaliatory motive." *Id.* at 260 (internal quotations and citations omitted). Wingo has produced insufficient evidence to raise an inference of causation. Prior to her June meeting with Ruiz, Wingo had documented performance issues at EDSI. There were numerous complaints from EDSI management, EDSI employees, and external staff members. She also received a subpar performance review and was placed on a performance improvement plan. The record evidence shows that her termination in August was a continuation of her performance issues, not the result of her June meeting with Ruiz. As such, Wingo's prima facie case for retaliation also fails.

If Wingo had established a prima facie case of race discrimination or retaliation, the burden would then shift to EDSI to advance a legitimate, nondiscriminatory or nonretaliatory reason for firing Wingo. *See Smith*, 138 F.4th at 777. "This burden is 'relatively light: it is satisfied if the defendant articulates any legitimate reason for the discharge; the defendant need not prove that the articulated reason actually motivated the discharge.'" *Onely*, 697 F. Supp. at 425 (quoting *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 n.2 (3d Cir. 1997)). As discussed earlier, EDSI terminated Wingo for ongoing performance issues, documented by numerous complaints,

---

congressional representative about filing an EEOC complaint on June 16, 2022. Pl.'s Reply, ECF No. 29 at 12. Wingo provides no record of this and writing to the local congressperson does not qualify as engaging in protected activity under Title VII.

performance reviews, and improvement plans. Wingo failed to improve her performance after two improvement plans and continued to be the subject of complaints among her co-workers and supervisor. EDSI, thus, had a legitimate reason for the termination.[5]

Turning to Wingo's harassment claim, she must show (1) she suffered intentional discrimination because of her race; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected her; (4) the discrimination would detrimentally affect a reasonable person in like circumstances; and (5) there is a basis for employer liability. *Greer v. Mondelez Glob., Inc.*, 590 F. App'x 170, 173 (3d Cir. 2014). Courts "must consider the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 168 (3d Cir. 2013) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). "For discrimination to constitute severe or pervasive behavior, it must 'alter the conditions of [the victim's] employment and create an abusive working environment.'" *Nitkin v. Main Line Health*, 67 F.4th 565, 570 (3d Cir. 2023) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)). As such, the "'conduct must be extreme' to satisfy this standard, so 'simple teasing, offhand comments, and isolated incidents (unless extremely serious)' are inadequate." *Id.* (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).

The only act that may be considered here is the Chipotle flyer incident involving Foster. Wingo believes that Foster left the flyer on her desk because Wingo is Black. However, that incident is insufficient for a harassment claim. First, as Wingo acknowledges, Foster is not a

---

[5] Because Wingo fails at steps one and two of the *McDonnell* burden-shifting framework, the Court does not consider step three.

supervisor, Dep. R. Wingo, 80:25-81:7, ECF No. 26-4 at 81-82, so there is no employer liability. *City of Boca Raton*, 524 U.S. at 777 (holding that an employe is vicariously liable for "actionable hostile work environment created by a supervisor with immediate (or successively higher) authority over the employee"). Second, beyond Wingo's subjective belief, the incident was not objectively racially discriminatory, nor was it severe or pervasive behavior. Neither Foster nor the flyer made any mention of race. The flyer was advertisement for a management position at Chipotle. While it may have offended Wingo, it did not rise to the level of severe or pervasive discrimination based on Wingo's race. Accordingly, Wingo's harassment claim also fails.

**CONCLUSION**

In sum, because Wingo cannot make a prima facie case of discrimination and retaliation and because there is no evidence of severe and pervasive conduct for a harassment claim, EDSI's motion for summary judgment will be GRANTED and judgment entered in its favor.

An appropriate order follows.


BY THE COURT:


/s/ Juan R. Sánchez
Juan R. Sánchez, J.